UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STEFFON LOREN FLOYD,

                        Petitioner,               Case No. 22-cv-12690
                                               Hon. Linda V. Parker

v.

CHRIS KING,

                        Respondent.

_____/

## OPINION AND ORDER (1) DENYING PETITION FOR WRIT OF HABEAS CORPUS, (2) DENYING A CERTIFICATE OF APPEALABILITY, AND (3) DENYING PERMISSION TO APPEAL IN FORMA PAUPERIS

Steffon Loren Floyd, a Michigan prisoner, filed this petition for writ of habeas corpus under 28 U.S.C. § 2254. Floyd was convicted after a jury trial in the Wayne Circuit Court of first-degree criminal sexual conduct, in violation of Mich. Comp. Laws §750.520b, second-degree criminal sexual conduct, in violation of Mich. Comp. Laws §750.520c, and indecent exposure, in violation of Mich. Comp. Laws §750.335a. The convictions involved allegations that Floyd sexually abused three of his girlfriend's young daughters. The trial court imposed a controlling sentence of 40 to 70 years' imprisonment for the first-degree conviction and lesser concurrent terms for his other convictions.

Floyd raises four claims in his petition: 1) the prosecutor committed misconduct by withholding evidence suggesting that the complainants' dreamt or imagined they were sexually abused; 2) statements attributed to Floyd in his medical records were erroneously excluded as hearsay; 3) the trial court coerced a deadlocked jury to reach a verdict; and 4) the prosecutor committed misconduct during rebuttal argument. The Court will deny the petition because the claims are without merit. The Court will also deny a certificate of appealability and deny permission to appeal *in forma pauperis*.

## I.      Factual Background

The charges against Floyd arose after the Michigan Department of Health and Human Services received a complaint that he sexually abused one of his girlfriend's daughters. (*See* ECF No. 9-15 at PageID. 881-84, 968-69, 971.) Child Protective Services investigated the complaint and subsequently removed three children from the home Floyd shared with his girlfriend, Dominique Rucker - 14-year-old I.S., 13-year-old Z.S., and 9-year-old E.P. (*See id.* at PageID. 977.)

All three girls participated in forensic interviews. They claimed that between 2015 and 2019, Floyd came into their bedrooms at night and touched them in a sexual manner. (*See* ECF No. 9-14 at PageID. 625-35; ECF No. 9-15 at PageID. 21-30.) The girls also claimed that Floyd offered them candy and money in exchange for sexual contact. (ECF No. 9-14 at PageID. 627, 631-34, 667-68.)

The youngest victim, E.P., testified that she engaged in fellatio and other forms of sexual penetration with Floyd on numerous occasions, and that sometimes "spit" came out of Floyd's penis. (*See id.* at PageID. 620-26.) A medical examination performed a few days after she was removed from the home revealed that E.P. had chlamydia, which is contracted by coming into contact with the secretions from an infected person. (*See* ECF No. 9-16 at PageID. 1045, 1047-48.)

E.P. testified that the assaults began when she was in the third grade. (*See* ECF No. 9-15 at PageID. 806-12.)  Floyd asked her to touch his penis, and then he would put it in her mouth. (*See id.* at PageID. 815.)  She estimated this occurred more than ten (10) times. (*See id.* at PageID. 816-18.) E.P. also testified that Floyd penetrated and touched her anus with his penis. (*See id.* at PageID. 819-20.) This happened more than twenty (20) times and was painful. (*See id.* at PageID. 820-22.)  Floyd also used his hands or fingers to touch both inside and outside of her vagina. (*See id.* at PageID. 823.)

Z.S. similarly testified that, on more than one occasion, Floyd tried to touch her under the covers while she slept. (*See id.* at PageID. 922-24.) Floyd tried to insert his finger inside her vagina two times. (*See id.* at PageID. 933.) He also asked her if he could put his penis in her mouth, but she refused. (*See id.* at PageID. 936.) Z.S. told her mother, Rucker, what happened, but Floyd denied the allegation. (*See id.* at PageID. 932.) Z.S. testified that she posted a message on

Instagram about being abused. (*See id.* at PageID. 947-49.) Z.S. used her friend's mother's phone to make the post. Her friend's mother made a report to CPS. (*See* ECF No. 9-16 at PageID. 1014.)

I.S. also testified that she was sexually assaulted by Floyd. The first incident occurred while she was resting in the living room recovering from a broken leg. Floyd asked her for a sexual favor for money. (*See* ECF No. 9-15 at PageID. 808-10.) Another incident occurred when I.S. was in the fifth or sixth grade. She woke up in bed and found Floyd there with her with his pants pulled down. (*See id.* at PageID. 809-16.)

Rucker testified that she confronted Floyd on several occasions about the allegations made by her daughters, but because Floyd either apologized or denied that he did anything, she took no action. (*See id.* at PageID. 886-87.) Rucker had nowhere else to go with her children. (*See id.* at PageID. 890-91.)

Rucker testified that all of her daughters were taken by CPS in December of 2018, followed by her sons in January of 2019. (*See id.* at PageID. 899-900.) She ended her relationship with Floyd after her children were taken away. (*See id.* at PageID. 901.) Rucker was charged with second-degree child abuse, which was reduced to fourth-degree child abuse after a plea agreement. She was sentenced to 5-years' probation. (*See id.* at PageID. 912-15, 921.)

Floyd's medical records from two visits to a doctor were admitted at trial. (*See id.* at PageID. 900-02.) They indicated that on June 28, 2019, Floyd was treated with an antibiotic for a dental infection. (*See id.* at PageID. 994-95.) On October 16, 2019, Floyd tested negative for chlamydia. (*See id.* at PageID. 995, 999-1000.)

The jury found Floyd guilty of the three charges related to the youngest victim, E.P., but it acquitted him of the charges related to the two other girls. (*See* ECF No. 9-18 at PageID. 1262-64.)

Following his conviction and sentence, Floyd filed a claim of appeal in the Michigan Court of Appeals, which raised the following claims:

I. *Brady* violation: the prosecution withheld potential impeachment evidence related to Floyd's girlfriend.

II. Evidentiary error: the trial court abused its discretion by striking a statement included in Floyd's medical records.

III. Deadlocked jury: After the jury sent three notes indicating it could not reach a unanimous verdict, the trial judge, should have *sua sponte*, declared a mistrial.

IV. Prosecutorial error: the prosecution improperly shifted the burden of proof and suggested that defense counsel could have presented Floyd's medical records.

V. Sentencing error: Floyd is entitled to a new sentencing hearing because the trial court failed to offer adequate reasons for the sentence imposed.

The Michigan Court of Appeals affirmed in an unpublished opinion. *People v. Floyd*, No. 352875, 2021 WL 2619685, at *5 (Mich. Ct. App. June 24, 2021).

Floyd, subsequently, filed an application for leave to appeal in the Michigan Supreme Court, raising the first four claims, along with two new claims:

> VI. Ineffective assistance of trial counsel: failure to investigate and call an exculpatory witness; and

> VII. *Brady* violation: the prosecution suppressed favorable evidence by not having Floyd tested for STDs.

The Michigan Supreme Court denied Floyd's application by standard form order. *People v. Floyd*, 969 N.W.2d 30 (Mich. 2022) (Table).

Floyd then filed the instant petition. Respondent filed a motion to dismiss the petition, asserting that Floyd's Fifth, Sixth, and Seventh claims were unexhausted. (*See* ECF 8.) Floyd filed a response stating that he wished to delete his unexhausted claims and proceed on his four exhausted claims. (*See* ECF 10 at PageID. 1556.) The case is now before the Court on Floyd's four exhausted claims.

## II.   Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") imposes the following standard of review for habeas cases:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application" occurs when "a state-court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 409.

AEDPA "imposes a highly deferential standard for evaluating state-court rulings," and "demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal citations omitted). A "state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). A "readiness to attribute error [to a state

court] is inconsistent with the presumption that state courts know and follow the law." *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002).

A state court's factual determinations are presumed correct on federal habeas review. *See* 28 U.S.C. § 2254(e)(1). This presumption is rebutted only with clear and convincing evidence. *Id.* Moreover, for claims adjudicated on the merits in state court, habeas review is "limited to the record that was before the state court." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

### III. Legal Analysis

#### A. Exculpatory Evidence

Floyd first claims that the prosecutor withheld exculpatory evidence. Specifically, Rucker testified at trial about an incident occurring when the family resided on Harlow Street. Early one morning Rucker heard Z.S. crying. Rucker went into the bedroom, and Z.S. complained that Floyd had touched her. Floyd denied the allegation and apologized. (*See* ECF No. 9-15 at PageID. 918-19.)

On the next trial date, defense counsel elicited from a police officer that neither of Rucker's police statements contained allegations about the Harlow Street incident. The officer testified that she had just learned of the allegation a few days prior to trial, and defense counsel was not informed about it. (*See* ECF No. 9-16 at PageID. 1021-24.)

8

Floyd argues that the withheld information prejudiced his defense because the story suggested the possibility that Z.S. simply had a bad dream about Floyd, and she woke up crying. Floyd asserts that had he known about the alleged incident earlier, he might have presented a defense that the children had imagined or dreamt about being sexually abused by him. (*See* ECF No. 1 at PageID. 35-36.)

The Michigan Court of Appeals rejected the claim on the merits, stating in part:

> Preliminarily, defendant cannot complain that the evidence at issue was suppressed because he had actual knowledge of the evidence at trial. The gravamen of a *Brady* violation is the prosecution's failure to disclose favorable evidence within its control unknown to the defense. *Chenault*, 495 Mich. at 153. To the extent that defendant's complaint actually concerns a delayed disclosure of evidence, not a total deprivation of that evidence, defendant's *Brady* claim fails because he has not shown that the evidence was favorable or material. DR's testimony that she saw defendant in her daughters' bedroom, supposedly looking for something, and that ZS woke up crying and complaining that defendant had touched her, was not favorable. Although defendant emphasizes that DR denied in her two police statements that she witnessed any sexual abuse, her challenged trial testimony is wholly consistent with her statements that she did not actually witness any sexual abuse. Defendant's claim that these belatedly revealed incidents could have somehow been used to support a defense theory that ZS was merely dreaming that defendant had touched her, and could have undermined the credibility of EP's allegations, is speculative at best, particularly considering that each of the daughters testified about their own interactions with defendant. Moreover, it is unclear why this testimony by DR would suggest that ZS was dreaming, and defendant fails to explain how the testimony could have been used to undermine the credibility of EP's allegations. Thus, defendant's claim of prejudice in this regard is unclear. Given the content of DR's testimony on which defendant now relies, defendant has not shown how knowing about this evidence earlier would have

altered his trial strategy or changed the outcome of trial. Therefore, defendant has failed to show a plain error affecting his substantial rights.

*Floyd*, 2021 WL 2619685, at *1-2 (footnote omitted).

Clearly established Supreme Court law prohibits a prosecutor from withholding exculpatory evidence. To demonstrate entitlement to relief on a withheld evidence claim, a habeas petitioner must show (1) that the state withheld exculpatory evidence and (2) that the evidence was material either to guilt or to punishment irrespective of good faith or bad faith of the prosecution. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963). Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 683 (1985); *see also Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

The Michigan Court of Appeals reasonably found that Floyd failed to demonstrate that he was prejudiced by the allegedly withheld information. First, while Floyd asserts that the statement suggested a defense based on the idea that the victims' dreamt or imagined the sexual abuse, Rucker's account does not support such a claim. Contrary to Floyd's characterization of the testimony, Rucker did not say that Z.S. woke up crying. Rather, Rucker testified that she was the one

10

who was asleep and was awoken by Z.S.' crying. (*See* ECF No. 9-15 at PageID. 918-19.) Z.S. was upset and told Rucker that Floyd had touched her. There was no evidence presented or withheld that Z.S. was sleeping or dreaming and started to cry because she had a bad dream. Moreover, Floyd was acquitted of the charges related to Z.S.

These factors allowed the state court to reasonably reject the claim for Floyd's failure to establish prejudice. The claim is without merit.

## B. Hearsay Exception

Floyd's second claim asserts that the trial court erred in excluding, on hearsay grounds, a statement attributed to him in his medical records. Floyd argues that he sought medical attention from a dentist for tooth pain, specifically, for "mild swelling around the back of a lower tooth." (ECF No. 1 at PageID. 39.) This statement was in Floyd's medical records. Also in those records was a reference to a statement he made to the dentist wherein, he "expressed reluctance about being prescribed any antibiotics for treatment of this dental problem because of the allegations related to [E.P.] having been diagnosed with [c]hlamydia." (*Id.*)

Floyd argues that his statement of concern to the medical provider showed that he honestly sought medical treatment for a dental infection, and he did not have a hidden motive to treat the same sexually transmitted infection exhibited by E.P. He further argues that the trial court erred in excluding this statement about

11

Defendant Floyd's apprehension regarding being prescribed antibiotics because the statement fit within the Michigan Rule of Evidence 803(4) exception to hearsay. *See* MRE 803(4) ("A statement that is made for - and is reasonably necessary to - medical treatment or diagnosis in connection treatment; and describes medical history, past or present symptoms or sensations, their inception, or their general cause."); *see also* ECF No. 1 at PageID. 40 (Petitioner arguing that "[u]nder the circumstances of this case, the statement made by [Petitioner] was made for the purpose of assuring the treatment he received would not interfere with the subject criminal case. [Petitioner] had a self-interested motivation to be truthful in order to receive proper medical care, but without that care being used against him in this criminal case.")

The rationale supporting the admission of hearsay under MRE 803(4) is "(1) the self-interested motivation to speak the truth to treating physicians in order to receive proper medical care, and (2) the reasonable necessity of the statement to the diagnosis and treatment of the patient." *People v. Meeboer*, 484 N.W.2d 621, 626 (Mich. 1992).

The Michigan Court of Appeals, reviewing for abuse of discretion, found that the trial court's decision to exclude Floyd's statement expressing concern about antibiotics treating chlamydia and how that would impact his upcoming

12

criminal case as inadmissible hearsay, was not an abuse of discretion. *See Floyd*, 2021 WL 2619685, at *2.

"In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991) (citing 28 U.S.C. § 2241). Therefore, the only way habeas relief could be granted would be if the Court found the state evidentiary ruling to be so egregious that it "by itself so infected the entire trial that the resulting conviction violates due process." *Id.* at 72. "[T] he reviewing court will only grant federal habeas corpus relief where a violation of a state's evidentiary rule results in the denial of fundamental fairness, and therefore, a violation of due process. As the Eleventh Circuit stated, the standard in determining whether an erroneous evidentiary ruling 'constitutes a denial of fundamental fairness is whether the evidence is material in the sense of a crucial, critical, highly significant factor.'" *Jones v. Smith*, 244 F. Supp. 2d 801, 841 (E.D. Mich. 2003) (citing *Bundy v. Dugger,* 850 F.2d 1402, 1422 (11th Cir. 1988)) (quoting *Leverett v. Spears,* 877 F.2d 921, 925 (11th Cir. 1989)).

Errors in the application of state law, especially rulings regarding the admission or exclusion of evidence, are usually not to be questioned in a federal habeas corpus proceeding. *See Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (internal quotations and brackets omitted) ("Generally, state-court

evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental."); *see also Cathron v. Jones*, 190 F. Supp. 2d 990, 996 (E.D. Mich. 2002) (citing *Pulley v. Harris*, 465 U.S. 37, 41 (1984)) (alteration added) ("Petitioner's [hearsay] claim alleges merely a violation of state law, and the Court may not grant the writ on the basis of a perceived error of state law.").

Accordingly, an alleged error in the admissibility of evidence under Michigan's hearsay rules does not present a cognizable claim in a habeas corpus proceeding. *See Byrd v. Tessmer*, 82 F. App'x 147, 150 (6th Cir. 2003) (citing *Estelle*, 502 U.S. at 67-68). Floyd's claim that the trial court improperly excluded his statement to his medical provider under state evidentiary rules, therefore, does not provide a basis for habeas review.

Additionally, Floyd did not present the state courts with an alternative argument that exclusion of his statement violated his constitutional rights, and any such claim would not provide a basis for habeas relief because it would be unexhausted. *See* 28 U.S.C. § 2254(b). As previously mentioned, state-court evidentiary rulings cannot rise to the level of due process violations unless they "offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Montana v. Egelhoff*, 518 U.S. 37, 43

14

(1996) (quoting *Patterson v. New York*, 432 U.S. 197, 202 (1977)) (alteration added).

The ruling excluding the statement in the medical report did not render Floyd's trial fundamentally unfair. The ruling did not prevent Floyd from arguing that he legitimately sought medical treatment for a dental infection. The prosecutor submitted the medical evidence to explain why Floyd tested negative for the disease – he had recently been treated with antibiotics, not to argue that he was trying to cure himself of the disease through the guise of dental treatment.

Moreover, looking at the testimony of E.P., her testimony is of a different nature than that of the other victims, describing the sexual assaults, how many times they occurred and where they occurred. This testimony could explain why Defendant was convicted on charges related only to E.P., absent the evidentiary ruling regarding the chlamydia. Essentially, other evidence stood to convict Defendant Floyd, even if the hearsay statement were admitted.

### C. Jury Deliberations – *Allen* Charge

Floyd's third claim asserts that the trial court coerced the jury to reach a verdict after receiving notes that one of the jurors refused to participate in deliberations. The Michigan Court of Appeals found that the claim was not preserved for review because defense counsel approved the trial court's replies. Respondent asserts that the claim is therefore waived and procedurally defaulted.

(*See* ECF No. 13 at PageID. 1603-04.) Because it is more efficient to resolve the claim on the merits, however, the Court will bypass the procedural arguments. *See Hudson v. Jones*, 351 F. 3d 212, 215 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997)).

When a jury has difficulty reaching a verdict, a trial court may deliver a supplemental instruction requesting each juror to reconsider his or her respective position during continued deliberations. *See United States v. Levit*, 39 F. App'x 97, 104 (6th Cir. 2002) (citing *Allen v. United States*, 164 U.S. 492 (1896)). The constitutionality of a so-called *Allen* charge turns on whether the charge in question was "coercive." *Lowenfield v. Phelps*, 484 U.S. 231, 241 (1988).

A district court's decision to give a correctly worded *Allen* charge is not coercive per se. *See United States v. Robinson*, 872 F.3d 760, 773 (6th Cir. 2017). The question is whether the district court's charge to the jury was coercive in its context and under all of the circumstances. *See United States v. Taylor*, 814 F.3d 340, 373 (6th Cir. 2016). "Although circumstances alone can render an *Allen* charge coercive," the Sixth Circuit has "traditionally . . . found an *Allen* charge coercive when the instructions themselves contained errors or omissions, not when a defendant alleges that the circumstances surrounding an otherwise correct charge created coercion." *United States v. Frost*, 125 F.3d 346, 375 (6th Cir. 1997).

Here, Floyd asserts that the trial court's actions were coercive because the jury indicated it was unable to reach a verdict, yet the court sent the jury back to deliberations after already having read them an *Allen* charge. (*See* ECF No. 1 at PageID. 43.)

The circumstances and context in which the jury was ordered to resume deliberations indicate that it was not coerced. The jury began deliberations on a Friday. The jury's first note was sent to the court after about a half-day of deliberations. The note stated: "We have a juror that's not willing to reach any compromise, and he wants to go home." (*See* ECF 9-17 at PageID. 1222.) The court interpreted the note as indicating that one of the jurors was not willing to fulfill its obligations as a juror, and the court re-read the general instruction pertaining to deliberations:

> It is your duty as jurors to talk to each other, and make every reasonable effort to reach agreement. Express your opinions, and the reasons for them, but keep an open mind as you listen to your fellow jurors. Rethink your opinions, and do not hesitate to change your mind, if you decide you were wrong. Try your best to work out your differences. However, although you should try to reach agreement, none of you should give up your honest opinion about the case, just because other[s] disagree with you, or just for the sake of reaching a verdict. In the end, your vote must be your own, and you must vote honestly, and in good conscience.
>
> It's important to understand that I can't just let someone go home, because they don't want to be here.

(*Id*. at PageID. 1225-26.)

17

The jury was dismissed for the weekend after another hour and one-half of deliberations. (*See id.* at PageID. 1228-29.)  The jury returned the following Monday, and after about two hours of further deliberations it sent a note to the court indicating that it was deadlocked:

> We will not be able to reach a decision. I hate that I'm writing this, but what happens if we can't all work together, and come to terms?

(ECF No. 9-18 PageID. at 1248-49.)

The court then read the standard *Allen* charge:

> You have returned from deliberations, indicating you believe you cannot reach a verdict.
>
> I am going to ask [] you to please return to the jury room, and resume your deliberations, in the hope that, after further discussion . . . you will be able to reach a verdict.
>
> As you deliberate, please keep in mind the guidelines I gave you, earlier.
>
> Remember, it is your duty to consult with your fellow jurors, and try to reach agreement, if you can do so, without violating your own judgment.
>
> To reach a verdict, you must all agree, and the verdict must represent the judgment of each of you.
>
> As you deliberate, you should carefully, and seriously, consider the views of your fellow jurors.
>
> Talk things over in a spirit [] of frankness and fairness.
>
> Naturally, there will be differences of opinion.

You should each not only express your opinion, but also give the facts and reasons on which you base it.

By reasoning the matter out, jurors can often reach agreement.

If you think it would be helpful, you may submit to the Officer, a written list of the issues that are dividing, or confusing you.

It will then be submitted to me.

I will attempt to clarify, or amplify the instructions, in order to assist you in your further deliberations.

When you continue your deliberations, do not hesitate to rethink your own views, and change your opinion, if you decide it was wrong.

However, none of you should give up your honest beliefs about the weight, or effect of the evidence, only because of what your fellow [jurors] think, or only for the sake of reaching agreement.

As I indicated to you [] the last time [] I brought you out, there are twelve of you here.

[A]nd jury trials are something we do [] every day, here, through this criminal courthouse. And [] there's no reason, again, really, there's no reason for me to believe that another twelve individuals could not sit, and listen to the evidence, and come up with, uh, be able to reach a compromise. There's no reason for me to believe you guys can't do that.

(*Id.* at PageID. 1249-51.)

About five minutes later, a third note was sent out indicating that one juror would not follow the *Allen* instruction. The court brought the jury out again and instructed them as follows:

[A]gain, to each of you, it is your duty to follow the law.

19

You took an oath, prior to us commencing this trial.

And your oath was that you would sit, and listen to the evidence, and ultimately come to a verdict based on the law, that I give you, and the jury instructions are what kind of give you the guidelines, to that.

And the [] evidence as you've received it.

It is your duty.

Just, it is important to [] remember that, and to go in, and [] I understand, it can be, you know, sitting with twelve individuals can be frustrating, at time, especially when there's twelve strangers.

But again, I ask you each to go through that deadlocked instruction.

Reread the instruction.

[A]nd [] in hopes of being able to get everyone to follow the instructions that are within the deadlocked jury instruction, which I [] have given all of you.

All right?

[A]nd at this time, I'm going to ask that you all go back in.

And I don't want to read it again, unless anyone wants me to.

If anybody wants me to, you can raise your hand?

All right.

I don't see any hands.

I'm not gonna read it again. I'm simply gonna send it back in here.

But, again, I'm reminding you listened to testimony and evidence, for four days.

Please [] just follow the law in these instructions.

And [] make sure that when you are putting forth your reasons, you're putting forward the facts and evidence, as they were presented to you, throughout the course of this trial.

(*Id.* at PageID. 1253-56.)

Neither trial counsel viewed the third jury note as an indication that the jury remained deadlocked after the reading of the *Allen* charge. Rather, they understood the note to indicate that one juror continued to refuse to participate. Defense counsel stated, "I don't think [the jury] had an opportunity to even start to deliberate before that [third] note came out." (*Id*. at PageID. 1258.) Following a lunch break, the jury deliberated for about another hour and then sent a note indicating that it had reached a verdict. (*See id.* at PageID. 1260.)

The record shows that the jury was not deadlocked when it sent its first note. Rather, it seems as though one juror was unwilling to participate in deliberations and reach a decision. It was reasonable for the trial court to interpret that to be the situation, and to re-read the jury the instruction on its obligation to engage in deliberations. Nothing about the court's first instruction coerced a deadlocked jury to reach a verdict.

Then, early in the second day of deliberations, the jury indicated that it was indeed, deadlocked. At that point, nothing in the circumstances indicated that it

21

would be coercive for the court to read the jury the standard *Allen* charge. Nor does Floyd assert that  the second instruction was coercive.

The claim, instead, is that the third instruction was coercive given the circumstances. But this is not a case where, after the reading of a proper *Allen* charge, a deadlocked jury continued to deliberate for a length of time and then indicates that it still was unable to reach a verdict. Rather, it appears that minutes after the *Allen* charge was read, the uncooperative juror still refused to engage in deliberations. The court's third instruction essentially reminded the juror that he had taken an oath to serve as a juror and informed him of the obligation to participate. That instruction did not coerce one side of a deadlocked jury to abandon their decision and reach a verdict – it ordered a non-participating juror to engage in the process.

The Sixth Circuit has generally upheld "verdict-urging" charges, even when they contain flaws. *See, e.g.*, *United States v. Clinton*, 338 F.3d 483, 490 (6th Cir. 2003); *Williams v. Parke*, 741 F.2d 847, 850 (6th Cir. 1984). The jury here was not urged to reach a verdict. Nor was it instructed that it was required "to reach a decision in this case," and that requirement necessitated them "surrendering views conscientiously held." *See Hardaway v. Robinson*, 655 F.3d 445, 448 (6th Cir. 2011) (quoting *Jenkins*, 380 U.S. at 446). Rather, the trial court properly instructed the jury that all twelve of them were required to at least engage in deliberations. In

22

light of the particular circumstances presented here—where the court was confronted with a juror who, apparently, was unwilling to deliberate—the jury instructions were not coercive. Floyd fails to demonstrate entitlement to habeas relief on this basis.

### D. Prosecutorial Misconduct Claim

Floyd's final claim asserts that the prosecutor committed misconduct during rebuttal argument when it asserted that Floyd's failure to offer his own medical records as an exhibit suggested that there was something in his records that he was trying to hide. (*See* ECF No. 1 at PageID. 45.) Floyd asserts that the argument improperly shifted the burden of proof.

The Michigan Court of Appeals rejected the claim on the merits:

Defendant submits that the prosecutor's remarks during rebuttal argument denied him a fair and impartial trial and improperly shifted the burden of proof by suggesting that defense counsel could have presented defendant's medical records and that defendant was trying to hide something. We disagree.

We review claims of prosecutorial misconduct on "a case-by-case basis" by reviewing the challenged conduct in context to determine whether defendant received a fair and impartial trial. *People v. Brown*, 294 Mich. App. 377, 382-383 (2011). "A prosecutor may not imply in closing argument that the defendant must prove something or present a reasonable explanation for damaging evidence because such an argument tends to shift the burden of proof." *People v. Fyda*, 288 Mich. App. 446, 463-464 (2010). "Also, a prosecutor may not comment on the defendant's failure to present evidence because it is an attempt to shift the burden of proof." *Id*. However, prosecutors are afforded great

latitude when arguing at trial, *id*. at 461, and may fairly respond to an issue raised by the defendant, *People v. Brown*, 279 Mich. App. 116, 135 (2008). The prosecution may argue the evidence and all reasonable inferences that arise from the evidence as it relates to their theory of the case, and they need not state their inferences in the blandest possible language. *People v. Dobek*, 274 Mich. App. 58, 66 (2007).

The prosecutor's remarks were not improper because they were responsive to defense counsel's closing argument. The challenged remarks, viewed in context, were part of a permissible argument that was specifically focused on countering defense counsel's claims made during closing argument. Specifically, after emphasizing the evidence that DR had been diagnosed with chlamydia on several occasions, and the lack of evidence that defendant had been diagnosed with any sexually transmitted disease after the alleged assaults, defense counsel argued:

> You didn't see any Michigan Department of Health and Human Services document, regarding this man, Mr. Floyd.

> You didn't see that.

> And the medical professionals are required to report that. I submit to you, he hasn't had any of these kinds of diseases.
>
> * * *
>
> So, she's getting it from somewhere, from somebody, other than Mr. Floyd. And the Prosecutor wants to make an issue of this business of, uh, the Amoxicillin with Mr. Floyd.

> We gonna talk about the lack of evidence, again. The document that you will see, and I want you to look at it, where it talks about the Amoxicillin. Now, at the corner of that document, it says, there's sixty-six pages, sixty-five pages. Where are the other sixty-four?

> What's the Prosecutor hiding?

Why didn't they admit.

It is a medical record, kept in the ordinary course of business.

It's not a hearsay document.

Why didn't they admit all of it?

What are they trying to have you not see?

And prior to the date that that Exhibit, uh, is dated, in terms of the admission of this treatment, which I think is September, did he have some kind of—did Mr. Floyd have some kind of, uhm, medical treatment, to this dental problem, prior to that?

What is it that they don't want you to see? What is it that you—they don't want you to see?

The lack of evidence.

Implicit in the prosecution's theory was that EP contracted a sexually transmitted disease from defendant, and that defendant later obtained an antibiotic, allegedly for a dental infection, that treated the disease. Defendant denied any wrongdoing and part of his alternate exculpatory theory was that there was no evidence that he was diagnosed with chlamydia. Continuing this theory during closing argument, defendant asserted that DR had contracted chlamydia from someone other than defendant, implying that she transmitted the disease to EP, not defendant, and that this theory was supported by the prosecution's failure to present all of defendant's medical records. Given that defendant essentially proffered an argument that the evidence was insufficient to prove his guilt because of the prosecutor's failure to present all of defendant's medical records, the prosecutor permissibly responded that defendant also had the option to present his own medical records as exculpatory evidence. Further, while defendant complains that the prosecutor also improperly accused defense counsel of trying to hide something, it was defense counsel who first repeatedly suggested to the jury that the prosecutor was hiding something by not

25

presenting defendant's medical records. The prosecutor was merely responding in the same manner—using defense counsel's terminology—to support her responsive argument that defendant could have presented his own medical records as exculpatory evidence. Again, prosecutors may fairly respond to an issue raised by the defendant, *Brown*, 279 Mich. App. at 135, and they need not state their inferences in the blandest possible language. *Dobek*, 274 Mich. App. at 66. Consequently, the prosecutor's argument was responsive to the evidence and theories raised by the defense, and it did not shift the burden of proof.

*Floyd*, 2021 WL 2619685, at *3-4.

This decision did not involve an unreasonable application of the clearly established Supreme Court standard for claims of prosecutorial misconduct. "Claims of prosecutorial misconduct are reviewed deferentially on habeas review." *Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004). A prosecutor's conduct will violate a criminal defendant's constitutional rights only if it "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). To obtain habeas relief on a prosecutorial misconduct claim, a habeas petitioner must show that the state court's rejection of the claim "'was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Parker v. Matthews*, 567 U.S. 37, 48 (2012) (quoting *Harrington v. Ritcher*, 131 S. Ct. 770, 786-77 (2011)).

A prosecutor may not shift the burden of proof to the defendant. *See Patterson v. New York*, 432 U.S. 197, 215 (1977). Nevertheless, a prosecutor

"necessarily has 'wide latitude' during closing argument to respond to the defense's strategies, evidence and arguments." *Bedford v. Collins*, 567 F.3d 225, 233 (6th Cir. 2009) (quoting *United States v. Henry*, 545 F.3d 367, 377 (6th Cir. 2008)); *see also Wogenstahl v. Mitchell*, 668 F.3d 307, 330 (6th Cir. 2012). And a reviewing court may therefore consider whether a challenged statement by the prosecutor was "invited by or was responsive" to the defense. *See, e.g.*, *Darden v. Wainwright*, 477 U.S. 168, 182 (1986).

Here, it was defense counsel in his closing argument who first brought up the fact that not all of Floyd's medical records were presented at trial. No comment was made in the prosecutor's initial argument regarding Floyd's failure to present evidence that he never had chlamydia. Rather, during trial, the prosecutor offered into evidence a small part of a sixty-five-page medical record that indicated that Floyd had been treated with antibiotics. The evidence was relevant to show why it was possible for one of the victims to have contracted chlamydia and for Floyd to later test negative. It was defense counsel who attempted to leverage the fact that the prosecutor did not offer the entire medical record to suggest that the other pages might contain exculpatory information. It was in response to this argument that the prosecutor stated in rebuttal that if the rest of the records were beneficial to the defense, then Floyd could have presented them himself.

Such an "invited response" by the prosecutor was appropriate. Considering the argument raised by defense counsel, the prosecutor did no more than "respond substantially in order to 'right the scale.'" *United States v. Young*, 470 U.S. 1, 11-13 (1985) (noting courts have "refused to reverse convictions where prosecutors have responded reasonably in closing argument to defense counsel's attacks, thus rendering it unlikely that the jury was led astray"); *see also United States v. Dalton*, 574 F. App'x 639, 645 (6th Cir. 2014) (noting that the court must weigh the prosecutor's statements against defense counsels statements to determine whether the prosecutor acted improperly).

The prosecutor did not shift the burden of proof onto Floyd. She fairly and reasonably responded to defense counsel's speculative argument that the portion of the medical records that were not admitted at trial would have benefited the defense. The state court adjudication of this claim did not involve an unreasonable application of the established Supreme Court standard. As none of his claims merit relief, the petition will be denied.

## IV.    Conclusion

Before Floyd may appeal this decision, the Court must determine whether to issue a certificate of appealability. *See* 28 U.S.C. § 2253(c)(1)(A); Fed. R. App. P. 22(b). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

To satisfy § 2253(c)(2), Floyd must show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citation and internal quotation marks omitted). The Court finds that reasonable jurists would not debate the resolution of any of Floyd's claims. The Court will, therefore, deny a certificate of appealability.

Finally, Floyd is not entitled to permission to appeal *in forma pauperis* because any appeal of this decision would not be taken in good faith. 28 U.S.C. § 1915(a)(3).

## V.    ORDER

**IT IS HEREBY ORDERED** that the petition for a writ of habeas corpus is **DENIED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that a certificate of appealability is **DENIED**.

**IT IS FURTER ORDERED** that permission to appeal *in forma pauperis* is **DENIED**.

**SO ORDERED.**

s/ Linda V. Parker
LINDA  V. PARKER
U.S. DISTRICT JUDGE

Dated: July 1, 2024

29

I hereby certify that a copy of the foregoing document was mailed to counsel of record and/or pro se parties on this date, July 1, 2024, by electronic and/or U.S. First Class mail.

s/Aaron Flanigan
Case Manager